## 5997. VER NOOY *v.* PITNER.

1. In a suit upon a promissory note, in which a surety thereon had pleaded a release by reason of the fact that he was exposed to greater risk by an act of the creditor in extending, without the knowledge or consent of the surety, the time of payment of the note in question, evidence that the surety accepted property from the principal debtor after the time of payment had been extended was admissible. The testimony that the surety accepted certain certificates of stock from the principal debtor, confessedly for the purpose of indemnifying himself against probable loss on account of the suretyship, might authorize the jury to infer that the surety actually knew (as he must be presumed to have known) that the note was outstanding; and furthermore, the fact that the principal debtor, at the request of the surety, had delivered property to the surety for the purpose of protecting him not only might amount to a ratification of an extension of the note, but would impose upon the surety ex æquo et bono the duty of discharging the obligation of his principal, unless the stock given to him to indemnify him against loss was of a value less than the amount of the note.

2. A contract which by law is required to be in writing can not be changed by parol evidence so as to substitute therefor, by novation, a contract which is also required by law to be in writing. Evidence of a parol agreement is inadmissible to establish the novation of a contract by law required to be in writing.

3. In order to discharge a surety by an extension of time to the principal, not only must there be an agreement for the extension, but the proof must show that the indulgence was extended for a definite period fixed by the agreement.

DECIDED SEPTEMBER 25, 1915.

Complaint; from city court of Athens—Judge West.    August 31, 1914.

*Holden, Shackelford & Meadow,* for plaintiff.

*S. C. Upson, Green & Michael, E. K. Lumpkin, Thomas J. Shackelford,* for defendant.

RUSSELL, C. J.    Suit was brought in the city court of Athens by Charles A. Ver Nooy against J. N. Webb, principal, and R. J. Hancock, E. H. Youngkin, and W. C. Pitner, as securities, on a promissory note.    Upon the trial it was agreed that Webb, Young-

kin, and Hancock had been discharged in bankruptcy from liability upon the note, and the only issue for trial was whether or not W. C. Pitner had been released from liability as security. The jury returned a verdict in favor of the defendant, and Ver Nooy excepts to the judgment overruling his motion for a new trial. The note was dated May 31, 1907, and was due twelve months after date, with interest from date at the rate of seven and a half per cent. per annum. At the maturity of the note, on May 31, 1908, it was not paid, but the accrued interest, amounting to $150, was paid, and, according to the evidence, the creditor· elected not to sue upon the note then, and, so far as appears from the record, the surety did not give the payee of the note the statutory notice for the purpose of relieving himself. It is uncontradicted that the extension of the note from May 31, 1908, to May 31, 1909, was without any agreement and without consideration. Some time in June, 1909, after more than another year's interest had accrued, Mr. F. C. Shackelford accosted the principal, Mr. Webb, and said, "Joe, Mr. Ver Nooy has been after me about the interest due on that note." To this Mr. Webb replied that Ver Nooy had called his attention to it by letter, and that he overlooked it, but he would attend to it at once. Shackelford then said that Ver Nooy was particular about collecting his interest when due, and continued, as Webb was walking away, with the statement that Ver Nooy was getting dissatisfied about the rate of interest that was being paid; that he was getting eight per cent. for his other money. Webb replied that they would not have any disturbance about the extra one-half per cent. Within two or three days after this conversation Webb sent Ver Nooy a check for $160. Webb testified that he had never in his life had any conversation with Ver Nooy about the payments, but that in 1910, 1911, and 1912, each time "at the interest-bearing periods at the end of the year," he paid $160. Webb testified, "I didn't pay any interest in advance," and in another place in his testimony, in referring to the payments of $160, he said, "I gave that to Mr. Ver Nooy," and "when I paid Mr. Ver Nooy in 1909 there was nothing said about the extension of the paper." This witness further testified: "Nothing was said by Mr. Shackelford that if eight per cent. was paid the note would be extended, or anything at all said about the extension of the note. . . Mr. Shackelford did not say anything to me about any agree-

ment or contract. He did not say anything about whether I would have to pay seven and one-half per cent. or eight per cent. He did not say anything about whether or not the note would be extended. He told me that Mr. Ver Nooy was dissatisfied for the reason that he was getting eight per cent. from other people. I sent him eight per cent. on the money, and that is as plain as I can tell it. When I paid the eight per cent. I did not know that I would be given another year on the paper. I just paid it because the interest was due." Mr. Pitner testified that he was not consulted with reference to an extension of the note when it matured on May 31, 1908, nor was he consulted as to the payment of eight per cent. interest instead of seven and a half; that he did not know the note was in existence, or anything about it, until Webb failed; that he did not know that the note had not been settled at its maturity; that the note could not now be collected from either the principal or the other sureties. Pitner further testified: "On the morning Webb failed I went to him to get some security to secure me on account of being indorser on the note sued on in this case, and he gave me, in order to indemnify me against loss on account of being security on the note, some Coca-Cola stock, which I have had ever since that time and still have." The court excluded this testimony and refused to allow it to go to the jury. Besides the usual general grounds, the motion for a new trial is based on assignments of error as to the charge of the court and as to the exclusion of the testimony of Pitner just above quoted.

1. We shall first consider the exception to the exclusion of the testimony. We think the court erred in ruling out this evidence elicited from the defendant, upon cross-examination. The witness had testified that he did not know that the note had not been paid or that it was in existence, and the fact that he went to Webb to get security to indemnify him against loss might be a circumstance to be weighed by the jury in connection with that statement. In the next place, it seems to us that a demand to be indemnified against loss could properly be considered by the jury as a ratification of the extension after he acquired knowledge that the note had not been paid. And besides that, if it had developed from further inquiry that the surety on the note procured from the principal property for the purpose of indemnifying himself, of equal or greater value in amount than his liability as surety upon the note, he would

be estopped ex æquo et bono from insisting that he had been released as surety; this regardless of whether the property turned over to him might be taken away from him by a court of bankruptcy and applied to the payment of the creditors of the bankrupt generally in accordance with their priorities.

2. The surety in this case contends that he was released because there was such a novation in the terms of the contract, without his consent, as to discharge him (Civil Code, § 3543), and also relies upon the provisions of section 3544, upon the ground that the act of Ver Nooy, in extending the time of payment, exposed him to greater liability and increased his risk. In the briefs and arguments of counsel many authorities were cited, addressed to the proposition that there was a novation by Ver Nooy's acceptance of the additional one-half of one per cent. On the other hand it was contended that there was no novation, because the additional one-half of one per cent. was, under Webb's testimony, a mere gift. Likewise, it is contended that Webb's agreement to pay one-half of one per cent. (if any agreement was made between him and Shackelford, as agent for Ver Nooy) was a collateral undertaking outside the original contract. Learned counsel for the defendant in error insist also that the risk of the sureties was increased because the successive payment for four years of the additional one half of one per cent. interest in pursuance of the agreement would authorize such a conclusive inference that the contract was changed that not even the maker himself could refuse thereafter to pay eight per cent. interest. In our opinion the proper determination of the questions presented depends upon a principle and a policy not suggested by either of the learned counsel. Of course, if the sayings and conduct of Webb, the principal, amounted to a novation, Pitner, as surety, would be released if the terms of the contract were changed without his consent. This is true even though the change might be beneficial to the surety. The rule is different in some jurisdictions, but in this State it has been uniformly held that a surety has the right to make his own contract, and that a change, even for his benefit, would release him, because no one has the right to make a contract for him. But if we place upon the testimony of Webb the construction most favorable to the defendant in error, for which his able counsel contends, a novation or change of the contract so far as relates to the subject of interest,

as a matter of law, could not have resulted in this case so far as to affect either the principal or the surety. Section 3426 of the Civil Code expressly provides that any higher rate of interest than the legal rate of seven per cent. per annum (in no event to exceed eight per cent.) "must be specified in the writing." The original contract was in writing. It stipulated a rate of interest in excess of seven per cent., and this term of the contract was not subject to change by parol agreement. It is not insisted that there was any other than a verbal agreement, either express or implied, to pay interest at the rate of eight per cent. per annum. In fact the evidence is uncontradicted that the agreement was not reduced to writing. A contract which is required by law to be in writing can not be subsequently modified by parol agreement, though it might be entirely abrogated. A number of rulings of the Supreme Court to this effect relate to contracts within the statute of frauds, but the principle of these rulings applies to all contracts required by law to be in writing. The principle is that where it is required by law that a contract shall be reduced to writing, it is contrary to public policy to allow the rights of a party to the contract to be talked out of existence. The ruling of the Supreme Court in *Augusta Southern Railroad Co.* v. *Smith & Kilby Co.,* 106 *Ga.* 864 (33 S. E. 28), in which the court ruled that "a contract which must, under the statute of frauds, be in writing, and which, accordingly, was put in writing and duly executed, can not be subsequently modified by a parol agreement," is based upon a prior ruling of the Supreme Court in *Simonton* v. *Insurance Co.,* 51 *Ga.* 76, in which the same rule had been applied to a contract of insurance, which, though of course not included in the statute of frauds, was required by express statute to be in writing. In the *Simonton* case Judge McCay, delivering the opinion of the court, said: "A written contract not required by law to be in writing might always be, subsequent to its making, altered or modified by a new parol contract based on a consideration. But if the law require the insurance contract to be written, it would seem to follow, as a matter of course, that any alteration of it must also be in writing, since at last every alteration is a new insurance contract, which, by the express terms of the statute, must be in writing." Paraphrasing the language of that ruling, it is clear that as the law requires a contract to pay a higher rate of interest than seven per

cent. to be in writing, it follows as a matter of course that any alteration of it must also be in writing, since the alteration is a new contract, which, by the express terms of the statute, must be in writing. In *Mitchell* v. *Insurance Co., 54 Ga.* 289, the court held broadly that "a contract required by law to be in writing can not be shown to have been altered by parol after its execution," and Judge McCay said: "It is generally true that a simple contract, though in writing, may be altered by a subsequent legal contract not in writing. But this can not apply to a contract required by law to be in writing. If the contract may be altered by parol, then there is a contract on the subject-matter by parol, and that is forbidden by statute." See also upon this subject *Hawkins* v. *Studdard,* 132 *Ga.* 265 (63 S. E. 852, 131 Am. St. R. 190), s. c., 136 *Ga.* 727 (71 S. E. 1112); *Crovatt* v. *Baker,* 130 *Ga.* 507 (61 S. E. 127); *Willis* v. *Fields,* 132 *Ga.* 242 (63 S. E. 828).

We come, then, to consider whether, under the evidence in this case, there was any act of the creditor which injured the surety, increased his risk, or exposed him to greater liability, so as to discharge him. An agreement with the principal to extend the time of payment for a consideration moving to the creditor may discharge a surety. What was the consideration moving to Ver Nooy, according to the evidence in this case, for the purpose of securing an extension of the time of payment? It was admitted that Webb agreed to pay an additional one-half of one per cent. as interest; and yet, under code section 3426, and in pursuance of a sound public policy which required such an agreement to be in writing, Webb's oral agreement was futile. But if it be said that the agreement was executed and that Ver Nooy actually received the amount of the one-half of one per cent. as extra interest each year, in what respect did that increase the liability of the surety Pitner or expose him to greater liability? He was still bound only by the terms of his contract, which provided for the payment of the principal and seven and a half per cent. interest thereon; and not only this, but the additional one-half of one per cent. per annum paid in excess of the interest must be credited, as a matter of law, upon the principal of the indebtedness evidenced by the note, and thus his risk is actually decreased. This would be true under the contention of counsel for defendant in error, though of course, as contended by counsel for plaintiff in error, if the jury should

believe that the additional $10 paid was merely a gift, without consideration, Ver Nooy would have the right to accept it without being compelled to apply it as a credit upon his note. It is clear to us that if an agreement to pay an additional sum in excess of the legal rate of seven per cent. was made, it could not prejudice the rights of the surety, since the debtor could not otherwise than in writing agree to pay a higher rate than seven per cent. To use the expressive language of the Supreme Court in one of the decisions upon this subject, there is no consideration for such an agreement unless the hands of the creditor are tied by the agreement; and under the evidence in this case, it can not be contended that if Ver Nooy had placed his note in suit the day after any payment of the additional interest was made, the principal could have pleaded in abatement of the suit that he had an agreement for an extension. And if this be not true, the evidence wholly failed to show that the agreement for an extension of time was for any definite period, even if it could be held that there was an implied agreement for the note to be extended. All of the payments that were made were at periods when more than one year's interest had accrued, and the witness Webb testified positively that he paid no interest in advance. The most that can be said of the evidence, therefore, is that the parties understood that there was to be an extension, but there was no proof of an agreement or understanding as to the duration of the extension. It is true that the several payments were entered upon the note, but there was no proof of an agreement or understanding as to the duration of the extension. The payments entered upon the note were made within a short time after the expiration of a year from the previous payment, and the first payment was made at the original maturity of the note, but no inference can be drawn from this that there was a fixed and definite understanding upon the receipt of each payment that there was to be an extension for the year or for any other period. As already pointed out, the hands of Ver Nooy were not tied, and therefore there was no consideration which would have prevented him from bringing suit at any time in his pleasure upon this matured obligation, and Pitner, the surety, could have done so if he had seen fit to pay the note and subrogate himself to the rights of the creditor. In order to discharge the surety by an extension of time to the principal, there must not only be an agreement for the extension, but the indul-

gence must be for a definite period. *Bunn* v. *Commercial Bank,* 98 *Ga.* 649, 650 (26 S. E. 63) ; *Woolfolk* v. *Plant,* 46 *Ga.* 423 (2).

For the reasons stated, the instructions of the trial judge on the subject of the discharge of the surety upon the ground of a novation of which complaint is made, were erroneous. The jury could not consider the evidence of a parol agreement for the purpose of determining whether there had been a novation of the contract, because it was not a contract which could be changed by parol. The evidence of the parol agreement might be considered by the jury in determining whether the agreement tended to increase the risk of the surety or to expose him to greater liability if it should appear that the agreement for an extension included a provision for an extension for a definite time.

The court erred in overruling the motion for a new trial.

*Judgment reversed.*